We will hear argument this morning in case 19-897, Pham v. Guzman Chavez. Mr. Suri? Mr. Chief Justice, and may it please the Court, Respondents are detained under Section 1231, not under Section 1226. In the first place, the text of Section 1231 refers repeatedly to an order of removal or to the aliens who have been ordered removed. That is clear from the caption, from the operative provisions, and from the definition of the removal period. There is no dispute here that these aliens have been ordered removed. Indeed, that is the definition of reinstating a removal order. In the second place, Section 1226 supports that conclusion. The best way to see that is to lay Section 1226 alongside the reinstatement clause. Section 1226 says that it applies pending a decision on whether the alien is to be removed, and the reinstatement clause says that these aliens shall be removed. Putting those two provisions together, it is clear that in the eyes of the law, the decision that has to be pending for Section 1226 to apply has been made in this case. And if the Court finds all of that unconvincing, it should turn to the structure of the statute. Congress put the provisions governing reinstatement, withholding, and the selection of the country of removal, all in Section 1231, not in Section 1226. That is a structural indication that it is Section 1231 that applies. I welcome the Court's questions. Mr. Suri, if an alien is in withholding-only proceedings, and there is no country other than the one as to which he claims statutory withholding or cat relief, can you remove him? No, we cannot, Your Honor. Well, then so your emphasis that the distinction is between whether and where really doesn't hold up across the board, does it? I appreciate, Your Honor, that the distinction between whether and where can seem artificial in a context where there is only one option, and that option potentially has been ruled out. Nevertheless, that is the distinction the statute requires us to draw, and we can see that in a few ways. First of all, in Section 1231A.7, Congress talks about a situation where the alien has been ordered removed, but removal to any country is impracticable or impossible because all of those countries have refused permission. Even in that context, it's 1231 that applies. That suggests that Congress did view whether and where as distinct. Second, that's the distinction that underlies the difference between withholding of removal on the one hand and asylum on the other hand. The court hasn't said in its precedence about withholding and asylum that the two are functionally the same simply because as a practical matter, whether and where can collapse into a single inquiry. Well, when you say it can collapse, that seems to me to suggest that the distinction you draw is not a valid one. You call it artificial, but it seems to me that it might be wrong, at least in the category of cases where there's no third country available, and I gather that's in the vast majority, right? That is correct, Your Honor. But one last point I'd make to defend the distinction is that the very availability of withholding of removal in the first place depends on the courts accepting that distinction. Recall that the reinstatement clause says that the removal order can't be reopened, can't be reviewed under any circumstances. The only way to square that with withholding is to say that withholding doesn't affect the removal order itself. It just affects the question where. Well, but isn't – why isn't – since it depends upon – whether you can actually remove the alien depends upon the particular circumstances of each case, whether there's a third country available. Why isn't that the touchstone that should be applied for whether a person's in 1226 or 1231, the particular circumstances? Because in Section 1231, the words are ordered removed. It doesn't refer to the practicalities of removal. And even in 1226, although the Court of Appeals read whether the alien is to be removed to refer to that practical question, respondents themselves have abandoned that argument. Thank you, Counsel. Justice Thomas? Thank you, Mr. Chief Justice. Counsel, just briefly, I know this wasn't briefed, but could you just explain to me briefly how the district court had jurisdiction under 1252 in this case? In this case, Your Honor, this was a habeas corpus petition, and the court in Zadvitas said that such a habeas corpus petition could be heard where the question is whether the government had the authority to detain the alien in the first place. The claim here is that the government doesn't have the authority to detain the alien unless it has provided bond hearings under Section 1226. So that basically trumps 1252? That is how the court read these provisions in Zadvitas, and that's the precedent we've stuck with here. Okay. And just again, could you explain to me what exactly we're reviewing here? The court is reviewing a determination that these aliens are entitled to bond hearings, but that determination depends on the contention that these aliens are detained under Section 1226 rather than Section 1231. So that's the issue before the court. Could you tell me what the difference is between an administratively final order and a final order of removal, if there is one? Yes. The term final order of removal is ambiguous. It could refer to a situation where the agency has completed its review, but the courts haven't completed their review, or it could refer to a situation where both the courts and the agency have completed their review. The use of administratively final clarifies that ambiguity, makes it clear that all we need to establish is that the agencies have completed their review. We don't need to ask about whether the courts are involved. So why doesn't it mean capable of being executed, then, if the agencies are done? The definition of finality in 1101A47 ties finality to whether the agency's review has been completed, and here the agency's review of the removal order itself has certainly been completed. The only question left to decide is the particular country, but that's a distinct question, as this court emphasized just last term in Nasrallah. Thank you. Justice Breyer? Thank you. Good morning. What percentage, if you know, of the individuals of whom there is a preliminary thing, does this person have a reasonable fear that he will be persecuted or tortured or whatever if he's removed to country X? So think of the group of where that is held by the ALJ or the administrative, the immigration judge, that is held to be a reasonable, he has a reasonable fear. Then they go on to decide whether that fear is in fact correct. Is it making a finding on that? What percentage of those who fall into the reasonable fear category, so the immigration service will look into it, what percentage is it found that they are, that they do, that they can't be sent to that country? Do you know? Yes, I do. Our best estimate is around 11%. Okay. So, and of those 11%, 98% never are sent anywhere. Is that right? That's what we're told in one of the briefs. Yes, that's right. So it's about 10% of those who are sent in that will never leave the United States. That's about right, yes. Okay. So given, that's a fairly good percentage, but not overwhelming percentage. So with 10% who will never leave the United States, can we say that it is administratively final? I mean, with 10% of these people, they will not leave the United States. You have a fairly good shot, a fairly good shot. And why is it, it's certainly not administratively final as to those 10%, they're never going to leave. What do you think about that? The best answer I have is this court's decision last term in Nasrallah, where the court said that the removal order's finality is not affected by cat protection. And it doesn't matter whether 10% or 20% or some other percentage do or don't ultimately leave the country. The court was very emphatic that the cat order is distinct from and doesn't disturb the validity of the final order of removal. So in your view, if in fact 98% of everyone who reasonably feared, reasonably feared removal for prejudice and torture, if 98% of them ended up never leaving the United States, do you think that this provision, 1331, would still require them to be held in custody without hope of bail for a long period of time, maybe several years? Yes. Is that your view? Yes, our position turns on what is true in the eyes of the law, not what ends up happening in practice. Well, there also are, I'm not necessarily going to argue, I would point out that there are traditions, there is a constitution, there is a country where by and large we don't keep people in prison for years, whoever they are, persons, for years, without any chance of even getting bail. Is that relevant to this? Certainly, but the question about detaining people for years doesn't arise in the vast majority of these cases, and when it does arise, the procedures in Zadvydas will address that problem. Justice Alito? Good morning, Mr. Story. I have a couple of questions about statements that you make in your reply brief. You say that the statute makes detention mandatory during the removal period only for terrorists and criminal aliens, so the two questions are these. First, does that mean that the Department of Homeland Security releases other aliens under supervision? And second, is there a process for deciding which of these aliens will be detained and which aliens will be released? Justice Alito, as to the first question, if the alien is released, then yes, it would be under supervision. As to the second question, the department tries to detain aliens during the 90-day removal period to the maximum extent possible. The releases would occur only if there are operational constraints, such as a lack of detention space in a particular facility. And no, there's no systematic framework for determining whether that decision is to be made. Rather, it's a case-by-case judgment depending on what's happening at that facility at that time. And who makes that decision? That would be made, I don't know the answer to that question, but I would imagine it's made by the local ICE field office. And what type of supervision occurs if there is release? The supervised release conditions are set out in Section 1231A3. It provides, for example, that the alien must appear before an immigration officer periodically for identification, must submit, if necessary, to a medical examination, and must obey written restrictions on the alien's conduct. All right, thank you. Justice Sotomayor? Temso, I'm not altogether sure I understood Justice Alito's question to you or your response. Can you clarify for me? How many people are denied supervised release after the 90-day period? After the 90-day period, I don't have exact statistics on that, but I took Justice Alito to be asking about the initial 90-day period, not after the 90-day period. So I'll ask about after the 90-day period. How many people are granted supervised release after that 90-day period? I don't have the statistics on that question, but Respondent cites a study that claims that 15% of the aliens are released at some point before the withholding-only proceedings are completed. So 85% are restrained? That's correct. Now, 1231A commands that the agency remove immigrants within 90 days. You seem to have admitted to Justice Breyer that that, in most cases, is impossible for this class of aliens. Now, if that is true, we have to pick between two provisions, 1226 and 1231A, and determine which controls the question of whether these aliens can be released on bond or bail or supervision. Why should we not adhere to the basic interpretive principle that counsels in favor of a harmonious reading and against choosing an interpretation that produces a substantial effect that is inconsistent with the text of another provision? If we accept your reading, basically we're saying for this class of withholding applicants that they're never going to be removed within 90 days of the finality of their removal order. That just doesn't make any sense to me. I appreciate the force of the argument, but I have two responses to it. The first is that the obligation is subject by its own terms to the phrase except as otherwise provided in this section. Then if you go down to 1231A5, the last sentence of that says that aliens with reinstated removal orders can be removed quote, at any time. We think that at any time takes precedence over the 90 days. I'm sorry, I'm not quite sure I follow that argument. You've already admitted to the Chief Justice that you can't remove these people who are in withholding proceedings because the law doesn't permit you to. I admitted to the Chief Justice that as a practical matter, these aliens can't be removed if there's no country willing to accept them. That was the same situation, by the way, in Zabitis where the government was searching for a country to which to remove the alien. That was analyzed under Section 1231. And your second point, counsel, in response to my question? My second point was that all that would raise is a structural inference about when the removal period would begin, but the court shouldn't rely on the structural inference when there's an express text stating when the removal period begins. Justice Kagan? Mr. Suri, if I could take you back to your colloquy with the Chief Justice. You were answering his question on the assumption that there was no third country that was available, but I even want to take it a little bit further and ask you, suppose you had a third country that for whatever reason was willing to accept an alien. If that alien was currently in withholding proceedings, you couldn't put him on a plane to that third country, could you? We could after we provide the alien notice that we were going to do that. Right. So that's what it would depend on, right? That you would have to provide him notice. And if he had a fear of persecution or torture in that country, he would be given an opportunity to contest his removal to that country. Isn't that right? Yes, that's right. So in this situation, as to these aliens who are currently in withholding proceedings, you can't put them on a plane to anywhere right now. Isn't that right? Certainly. I agree with that. Yes. OK. And that's not as a practical matter. That really is, as you put it, in the eyes of the law. In the eyes of the law, you cannot put one of these aliens on a plane to any place, either the country that's referenced in the removal order or any other country. Isn't that right? Yes, that's right. And in order to prevail in this case, I have to convince you that the line between 1231 and 1226 is not when the government acquires the legal ability to carry out the order. Rather, it's the entry of the order. OK. So, like, you have to convince me that it doesn't matter that you cannot deport the alien. Exactly right. Yes. OK. Let me ask you, you know, suppose there's an alien who just concedes removability and then seeks withholding relief. And the IJ enters the order of removability, of removal, and grants withholding. And then that's appealed by the government. Would that alien be treated as if he were in 1226 or as if he were under 1231? That would never arise in practice, but if it did, that alien would be treated as under 1226 because in that context, which I presume is outside the reinstated removal order context, what happens is that the withholding proceedings and the removal proceedings take part together. They're not bifurcated. And so, in practice, the immigration judge wouldn't enter a separate removal order until after the withholding issue also is withheld. I guess the reason I ask is because that seems very similar to me, is that you have a final order of removal and a pending withholding decision, and yet you're going to treat that alien under 1226, but the aliens here under 1231. And I guess I wonder what difference that makes and what sense that differential treatment makes. Yeah, if we had a hypothetical world where the immigration judge were to enter an order of removal that everyone concedes is valid and then conduct separate withholding-only proceedings, then I agree, it would be 1231. All I'm saying is that doesn't happen. Justice Gorsuch? Good morning, Mr. Suri. I wanted to ask about a passage in your reply brief on pages 12 and 13. Your argument, as I understand it, is under 1231 there is a final order of removal dating back to the original order of removal. But for purposes of 1252, the question becomes, is there some chance for judicial review of the withholding-only proceedings? And that statute also grants review only of the final order of removal. Judge Richardson acknowledged this difficulty in his dissent in the Fourth Circuit and said that means that there is effectively going to be no judicial review of withholding-only proceedings. But the government apparently in the Fourth Circuit thought that there could be. And here on 12 and 13, I see the government, forgive me, is maybe hedging its bets and not really taking a position on this. And my question for you is, which is it? Is there review or not? And what do we do about the fact that 1252 uses the same, very similar language as 1231, a final order of removal? Surely a final order of removal can't mean one thing in one statute and another in another. That would seem unlikely, at least. So perhaps you can help me with that difficulty. Certainly, Justice Gorsuch. First, since you asked me to take a position, yes, the government's position is that review would be available and that final would have to mean something different in 1252. Second, if you think that final has to have the same meaning across all contexts, you should rule for us because the general definition of finality, the reinstatement clause, and Nasrallah all indicate that these orders are final. And so we've offered up the idea that finality can have a different meaning in order to preserve the body of precedent in the lower courts about review of withholding-only orders. Explain to me how that works, though. I mean, the term isn't finality. It's a final order of removal, and it's the exact same phrase in both statutes. So how would the government have us interpret that differently here? We'd have you interpret it differently on the understanding that final can mean different things in different contexts. For example, an order can be final for purposes of the Court of Appeals when the district court decides, can be final for purposes of this court when the Court of Appeals decides, can be final for purposes of habeas corpus when the entire direct review process is complete. And so it is possible for final to have different meanings, and the justification for giving final a different meaning in 1252 would be the presumption in favor of judicial review. But as I said, if the court disagrees with me about all that, then it would follow that these orders are final both in this context and in that context, and the aliens would lose in both cases. Thank you. Justice Kavanaugh. Thank you, Chief Justice. Good morning, Mr. Suri. In the Four Circuit's opinion by Judge Harris, the opinions offered a contextual argument, page 877. Quote, the fact that the removal period is limited to 90 days strongly suggests that it is intended to apply only when all legal barriers to removal are cleared away, end quote. In other words, using the fact of the 90-day limit to help interpret these two provisions together. What's your response to that argument? Justice Kavanaugh, the first response is that the purpose of the removal period is to give the government time to identify a country of removal and to clear away the legal, diplomatic, and practical obstacles to removing the alien to that particular country. So it doesn't make sense to say that the removal period begins only when all of the legal barriers are cleared away, when the whole point of the period is to give time to clear away some of those barriers. Second, the removal period definition says that the removal period begins upon the completion of three specified events, and those three specific legal barriers are the only ones that need to be cleared away. It's inconsistent with that specification to say, no, actually the removal period begins not only when those three barriers are cleared away, but when some other unspecified universe of additional barriers also is cleared away. To pick up on one of Justice Breyer's questions, I think you acknowledged that some significant number of non-citizens in this circumstance could be detained for several years, and you indicated that Zedvitas would be the answer to that claims under Zedvitas. Your colleague on the other side says, instead of going through that trouble, why not read the statute here to avoid that potential constitutional problem as a matter of constitutional avoidance, and they say in their brief, quote, Congress simply did not write a statute that would render constitutional violations routine, end quote. Why don't we follow the lead suggested there? Let me first correct this idea that detention could last for years. In the vast majority of these cases, the detention will last three to four months before the immigration judge issues his decision, and that's no problem even on respondents. It's a very unusual case, which will last more than six months. Now, more than six months, we have both the Zedvitas procedures, which the Zedvitas court has already told us cures any constitutional problem, and we also have the regulatory procedures for post-order custody review. And finally, in all these cases, the alien is being detained because we've made a determination that the alien is a flight risk or a danger to the community. That's the trigger we've used to detain the alien under Section 1231A6 for more than three months. Now, if those criteria are satisfied, they should be detainable even on respondents here. Thank you. Justice Barrett? Counsel, I have a question about the post-order custody review. Once the removal period ends, once you hit that 90-day mark, do the regulations that govern the post-order custody review automatically kick in so that the detained noncitizen gets some sort of hearing? Yes, they automatically kick in, and what happens in practice is that the government tries to conduct the review shortly before the removal period has expired. And let me ask you this. In your response to Justice Sotomayor, you said that 85% of noncitizens in this category remain restrained after the removal period ends. And I'm wondering why the default isn't set to release with supervision, and here's my reasoning. As I look at the statute, the removal period itself is 90 days. But if it's the alien's fault that the government is not able to remove the alien during this 90 days, and I'm looking at the provision in A1C, which says if the alien fails or refuses to make timely application for travel documents, etc., that removal period, as defined in the statute, let's say it might be 200 days. But then I'm looking at A3, which talks about supervision after the 90-day period and says, you know, if the alien does not leave or is not removed within the removal period, defined as 90 days in the statute, it says the alien shall be subject to supervision under the regulations. So why isn't the default that if it's through the fault of the government, through no fault of the noncitizen, that removal doesn't take place within the removal period? Why isn't the default supervision rather than, as you suggested to Justice Sotomayor, continued confinement? Let me make two answers to that, Justice Barrett. The first answer is that A1C isn't about what happens after the removal period. Rather, it's a tolling provision. The 90 days themselves are extended. It doesn't talk about what happens after the 90 days. And then the second answer is that we agree that for aliens in general, for the whole universe of aliens, not just those with preinstated removal orders, yes, supervised release is the default, and the findings specified in A6 must be made before the government can continue to detain those aliens for more than 90 days. Our point is simply that because these particular aliens have already been removed from the country, have defied their removal orders, and have come back into the country illegally and been caught, there's a particularly strong basis for concluding that those aliens are a flight risk. And within that subset of aliens, it does make sense that A6 kicks in. Thank you. A minute to wrap up. Mr. Shuri? Mr. Chief Justice, I think a lot of the questions today have focused on the practicalities and whether the government in practice would have the ability to remove these aliens. But I'd like to just remind the court quickly that respondents themselves have abandoned that argument. Thank you. Thank you, Counsel. Mr. Hughes? Mr. Chief Justice, and may it please the court, this case addresses narrow circumstances. Individuals who, after removal, face persecution, return here to escape, and have already been found to have a reasonable fear of persecution. 1226, not 1231, governs detention. During withholding proceedings, the INA does not authorize removal. When the government lacks authority to remove, the decision on whether the alien is to be removed from the United States remains pending. This is the language of 1226. Whether removal will occur cannot be divorced from where. If withholding is granted, the answer to where an individual is removed is virtually always nowhere. 1231 is not a fit. It defines the removal period as the time the government shall remove the noncitizen. It is for securing travel documents and effectuating removal. The government's contrary view is not plausible. It would have the removal period begin and end long before it could remove the person anywhere. In 1231, A1A is the gateway. First, it defines the removal period. That time cannot begin before the INA authorizes the government to do the one thing required, remove. Second, this conclusion is required by the first clause of A1A. Finally, it says except is otherwise provided in this section. Withholding relief is provided for in 1231. When there is withholding, the government cannot remove, meaning there is no removal period. Third, this makes sense of Congress's determination that the removal period lasts 90 days. And all 1226 provides indefinite detention while proceedings are underway. Then, after the INA authorizes removal, the removal period begins and 1231 applies. Counsel, your clients have been ordered removed. And wouldn't you expect that their detention would be governed by a provision that is entitled, quote, detention and removal of aliens ordered removed? It seems to fit your clients precisely. Two responses, Your Honor. That's overinclusive. As the structure of 1231 makes clear, there are a variety of individuals who can be described as ordered removed that the statute makes plain are not subject to 1231 detention. So that argument the government proffers, I don't think, can lead to the conclusion. The second point, though, is what is the order that is critical here? In this context, you can't separate out the reinstatement order. We agree that when the underlying order of removal is reinstated, that order, of course, has effect. But it only has effect when it's merged with the reinstatement order. And let me explain that. When you have a prior order of removal that's being reinstated, the reinstatement order makes certain critical determinations. For example, that the noncitizen is actually the same person as an issue in that prior order. Additionally, that the noncitizen unlawfully entered the United States. Until you have that determination that is in the reinstatement order, the underlying order of removal does not have legal effect under the INA. Well, what do you do about 1231A5, which says that a reinstated removal order, a quote, is not subject to being reopened or reviewed? I mean, you're taking the position that the withholding only proceedings prevent that order from becoming final. And yet that would seem to me to be reopening and reviewing it. Well, I think the court dealt with this in Fernando Vargas. And the government doesn't disagree that notwithstanding what does look like categorical language in A5, there is still the right to withholding that's provided for by statute in fulfillment of the United States' treaty obligations. And I think the best way to reconcile that A5 language that Fernando Vargas tells we have to reconcile with the right to withholding is to understand that reinstatement is a process. This is how the regulations describe it. For example, 8 CFR 208.31A. It talks about the reinstatement process. And we think that that reinstatement process is conclusive and final at the time that the withholding only proceedings conclude and that order is subject to execution. I suppose is your answer the same to what we said in Nasrallah that a CAD order, quote, does not affect the validity of the final order of removal? Yes, Your Honor. I'm sorry. I just want to make sure that you'd have the same answer to the previous question I asked. Yes, Your Honor. Two responses. It's the question of when is it that it becomes final. But second, stepping back, and I know I believe this gets to the administrative finality trigger in A1B. We believe if the court looks there, for all the reasons I just described, you would not conclude it's administratively final until it's executable and that process concludes. Thank you, counsel. Justice Thomas? Thank you, Mr. Chief Justice. Mr. Hughes, I'm a bit confused. So we had a removal order that a respondent was subject to. We agree on that. Respondent returns to the country. Now, what happens to that underlying removal order in your assessment? Your Honor, for that underlying removal order to be reinstated, there have to be certain determinations that are made, which includes identifying that the person at issue is the same person that was subject to and deported on the first time pursuant to that removal order. Second, that the individual, in fact, unlawfully reentered the country. Let's assume that's accurate, that we're not debating the factual part. What's the effect of the process of reinstating removal? Your Honor, when you have that reinstatement order, it does bring back to life the underlying order of removal. And so with the underlying order of removal and the reinstatement order paired together, when that process is final, it does authorize the United States to remove an individual when that process is concluded. So why is that? How do you reconcile that? And this goes back to the Chief Justice's point. How do you reconcile that with what the court said about CAT orders and Nasrallah? Two reasons, Your Honor. First is, when do we think that this process reaches conclusion? And we think the process reaches its conclusion, its administratively final, at the point that it's executable. And that's important because otherwise the categorical language of A-5 would seem to allow the government to remove an individual during the pendency of the withholding process. But the government doesn't take that position. My friend on the other side made that quite clear. If they cannot do so, that would be in violation of the statute. But my first point, if I can for a moment, is that we don't think the court even needs to reach A-1B, an administrative finality, and that's because A-1A is the gateway that defines what the removal period is. And if the removal period, if the government categorically does not have authority to remove, it makes no sense to conclude that the removal period, the 90 days during which the government shall remove, has begun. It simply doesn't meet the definition without even getting into the A-1B. Thank you. Justice Breyer? Your last point, except as otherwise provided in this section, where is it otherwise provided that you have this, say, the torture statute claim and the persecution claim? Yes, Your Honor, it's in B-3. 1231B-3 is the provision of 1231 that says when you have a withholding claim, the attorney general may not remove an alien. And so Your Honor is precisely right. It's that except clause which shows that when the government does not have authority under the INA to remove, the removal period does not begin. And that makes sense of this statute, the 90 days during which the government has one obligation to remove. That's why this is the time period Congress wrote in. It's also why in A-1C the noncitizen has certain obligations, for example, to cooperate in obtaining travel documents. That whole structure of the statute makes clear that the removal period is, as that title says, removal period is when the government shall remove. Now, do you mean to abandon the administratively final? The way I have been reading that is a possibility, though it favors you. Don't tell me I'm wrong right now if I'm wrong. Please. It won't do any good. A-5 says reinstatement. So you reinstate an order. The order says Smith, go. Now, we cannot question that order that says Smith, go. That's what it says in 5. You don't question that. But there are some things you could bring up. You could say, by the way, I'm Jones. I'm not Smith. And now you could also say, by the way, I don't want to go to country X because they're going to murder me, et cetera. And what supports that is the date the order of removal becomes. It doesn't say the date it was reinstated. It doesn't say became final. It says becomes final. And so something must have the possibility of happening. Between the time you enter the order saying an old order, go Smith, and the beginning of the removal period. Now, is that correct? Yes, Your Honor. We absolutely make and embrace that argument. If you make and embrace that argument, I can think of two things that stand between entry order, go Smith, and the beginning of the removal period, i.e., administratively final. One thing, what you say, hey, I'm not Smith. I'm Jones. Second thing, I don't want to go to country X. They're going to murder me. Are there a third, fourth, and fifth thing? I think that's principally it, Your Honor. I'm not aware of other things that would be in the way. Okay. Thank you. Justice Alito? Mr. Hughes, I want to follow up on the question that Justice Kagan posed to Mr. Suri. Do you agree that while an alien is in withholding only proceedings, DHS has the authority, the legal authority, to remove the alien to a third country so long as it provides the alien with notice of that third country removal and the alien does not express a fear of persecution or torture with respect to the third country? In those circumstances, do the statute and regulations authorize DHS to put the alien on a plane leaving the country? Yes, Your Honor. If those conditions have been satisfied, and what that would typically result in would be a warrant of removal to that particular country, a 205 warrant of removal, and that would authorize under the INA removal to that country, and we would agree when that occurs that 1231 applies. But that requires, as you indicated, several legal steps between where an individual respondent is in our circumstances to the INA authorizing that. In Nasrella v. Barr, you were successful, and I wonder how you can reconcile the argument that the court accepted there about administrative finality with the position that you are taking here. Well, Your Honor, I think there's multiple reasons, but our first argument to start is the gateway provision of A1A, which is to say it defines and limits the removal period at the time that the government can actually execute on the removal order. And that is explained by the first clause, except as otherwise provided in this section. And withholding is within this section and alleviates or precludes the government from executing on the removal order. So I don't think the court even has to get to A1B in order to resolve this case, and that makes 1226, which this case fits perfectly within that language, harmonious with 1231 by understanding what the very definition of removal period is. And that obviates the court from even having to address questions of finality. But if the court does get to questions of finality, and for all the reasons Justice Breyer explained, the process becomes administratively final when this process concludes at the time of withholding. And my friend on the other side has a question. Let me ask you, let me squeeze in one more question. To what degree is your argument dependent on the statistics that were discussed earlier about the feasibility of removal to a third country? Suppose that there was a third country or third countries that were willing to accept these aliens. Would you have an argument then? Your Honor, if there was that sort of third country, I don't think we would even have these proceedings, because presumably instead of spending all this time and effort litigating these cases, the government would just remove individuals to those third countries. And so I think we'd be in a very different scenario. And if the government did have that country to identify, I agree we'd be in very different circumstances. It just doesn't. And that's why we're here. Justice Sotomayor? Counsel, how much of your argument depends on your due process concern? As I understood, one of your arguments in your brief is, if we read it the government's way, we're inviting the potential of due process violations. Is that correct? Yes, Your Honor. The government's point that they think is the back-end protection here, I think, is revealing on that end. All right. So that's my question to you. If the process provided by the government's regulations are not satisfactory, can't the noncitizens do what you did here, just get habeas review? And why wouldn't that be enough? Your Honor, I think that this goes to the very purpose of constitutional avoidance, as Justice Scalia explained to the Court in Clark v. Martinez, which is to say, rather than set up a structure where the courts have to do individualized determinations as to whether or not detention is constitutionally excessive in individual cases, if there's a plausible alternative reading, and we think our reading is absolutely plausible, it makes the most sense to infer that Congress chose a statutory structure that was not going to lead to routine and predictable constitutional violations in at least some case. Now, my friend on the other side said that might not be in most of the cases, but Justice Scalia addressed that in Clark v. Martinez and said, if there's any predictable range of cases that leads to unconstitutional outcomes, that's pretty good evidence that's not the proper construction of the statute. If there's a plausible alternative. One of the amici here set out why they thought the administrative review process under 1231 is not adequate. Are you accepting the arguments of that amici? Your Honor, I think you may be referring to the ACLU, and it's exactly the arguments that this Court in Zedvitas adopted, which is to say there's no neutral arbitrator. One of the de minimis requirements of due process is before prolonged deprivation of liberty, having a neutral arbiter, and what the Court in Zedvitas said is it wouldn't be enough for a deprivation of property if there was a non-reviewable administrative agency that makes a property deprivation, and the same rules should govern in fundamental liberty interests. But to answer Justice Thomas' question, why wouldn't the habeas proceeding be enough to give you that review? Well, again, it goes back to the constitutional avoidance principle. Even if there is an option to vindicate the constitutional rights, here we're addressing what's the proper construction and interplay of 1226 and 1231, and given that we believe this is very plausibly read as being in 1226, the constitutional avoidance doctrine informs us that we shouldn't select the construction of the statute that is going to lead to grave constitutional concerns and the need to bring individualized habeas actions. Thank you. Justice Kagan. Mr. Hughes, just on this constitutional point again, I guess I'm a little bit confused as to what the government is saying about Zedvitas and how it serves as a backdrop. Is your understanding that once six months passes, all of the people in your client's position will be able to get hearings under Zedvitas? No, Your Honor. It's not my understanding. It's actually quite the contrary. When these individualized claims are brought, the government resists them. So it's not the case that they get individualized hearings under Zedvitas, no. Well, why is that? What grounds does the government resist them on, on the view that removal is – that they haven't satisfied the standard of reasonable foreseeability of removal? Is that the idea? That is the argument that the government advances, and then the lower – the courts have to address that argument on an as-applied basis, yes, Your Honor. I mean, could you give me a little bit more on that? Like, what does the government say, and what have courts been holding with respect to this? Your Honor, there's mixed results in the lower courts. They are a bit all over the map as to what they think the standard for Zedvitas would be in this context. The government makes the argument that if there are proceedings ongoing, that there is not reasonable foreseeability that is satisfied for that due process test. The noncitizens routinely make the argument that because of the prolonged nature, regardless of that foreseeability, there still needs to be an individualized detention. My understanding is that the district courts are somewhat mixed on this question. And many courts have found, notwithstanding the government's contrary argument, that there is very serious due process concerns that require a hearing, an individualized hearing in those circumstances over the government's objection to that principle. But the government's argument, as it goes through these cases one by one by one, is that aliens who are in withholding proceedings, even after six months, do not get Zedvitas hearings because in that case, detention, in that case, removal is still foreseeable. Yes, Your Honor, that's correct. Okay. That's all. Thank you. Justice Gorsuch? Good morning, Mr. Hughes. One of the government's main structural arguments in response to your 1226 submission is that Congress placed both the provisions governing restatement of remutable orders and provisions governing withholding orders in 1231, not 1226. What do you say to that? Thank you, Your Honor. To begin with the reinstatement provision, that's A5. I think it's understandable that it's in Section 1231 because, as we've explained, in more than 98% of cases, the individual does go immediately to Section 1231 detention and is promptly removed from the United States. This case is about the very rare exception when individuals have satisfied a reasonable fear interview, which is a very high threshold. I understand that. But, again, both the withholding as well as the reinstatement are in 1231. So you're saying, well, I want to talk about withholding, but that's in 1231 too. So what do we do about that? Your Honor, I think one way to think about withholding, and this goes to the hypothetical that I believe Justice Kagan posed earlier, is it's very normal for individuals in removal proceedings to concede their removability, not in reinstatement cases, but just in normal removal proceedings, to concede everything about removability and to only advance a withholding claim. That happens day in, day out in the immigration courts, and that's non-controversially subject to 1226 detention. These cases look exactly like that, and they fit well within the category of 1226 of protracted proceedings that make the determination as to whether the I.M.A. I understand all of that, and I'm sorry to interrupt, but what rational explanation is there for Congress to place that in 1231 then? Well, because Congress was placing where individuals are sent in the 1231B. With B2, you have the list of countries, and then B3, the list of countries for withholding to where the individual could not be sent. I think that's the rational basis on which this was structurally placed in 1231. But I don't think that bears on the detention question when we know that individuals in outside reinstatement proceedings who only have withholding claims are uncontroversially subject to 1226 detention, as I think my colleague earlier agreed. What do we do about the fact that we don't normally think of agency action becoming final just because a party doesn't press a request for additional agency action? This administrative finality argument all depends on the absence of any request for further agency action from an individual. That seems an unusual way to define agency finality. Can you help me with that? Yes. Again, to start with, and I hate to keep repeating, but we don't think you get to finality. But if you do get to finality, the key way to think of it is the reinstatement process. When does that conclude? And we think that when it's actually executable is a natural way to think of administrative finality. And again, the government's position, I think, has real problems here because, as they articulated earlier, they think that finality means two different things in this same particular statutory scheme. I got that argument. Thank you, Mr. Hughes. My time's expired. I'm sorry. Thank you. Justice Kavanaugh. Thank you, and good morning, Mr. Hughes. Looking at the language of 1226, it, of course, says pending a decision on whether the alien is to be removed. And then when you go to 1231, it makes clear that that decision on whether the alien is to be removed has really already been made automatically in the case of someone who reenters the country illegally because the prior order of removal is reinstated. So I know I'm covering ground that's been covered, but just trying to make sense of the precise text of these two provisions, it gets difficult to say that there's a decision pending on whether the alien is to be removed when the statute itself says they are to be removed, shall be removed, is the language of 1231. Can you help me on that? Yes, Your Honor. Two responses. First, that argument rests on the government separating out the whether and the where, and I think for reasons the Court well understands, we don't think it's anywhere near plausible to say you can decide the whether question or 1226 if the where question in 98 percent of the time is going to be nowhere. That just is not actually deciding the whether question or 1226. But the second point to address the reinstatement provision in A5, this goes back to the point I was earlier making. We appreciate that that language reads absolute in its terms, and that's why it has to be reconciled with withholding because if the Court read that to its absolute terms, that would mean it would nullify withholding proceedings for individuals in this category because it would mean that individuals could immediately be removed. The government agrees that that's not a plausible reading of the statutory text given the U.S. obligations here. And so the way that it gets reconciled is to appreciate the process of reinstatement and when that reinstatement can be deemed final, thus triggering the obligations or the rights under the A5 reinstatement process. That, we think, is most naturally understood to be when these withholding proceedings conclude, resulting in an order that is executable and administratively final. And these provisions, are they part of the 96 Act? Yes, Your Honor, I believe they are. The withholding provisions predate that, but the provisions you're referencing. Yeah, and the 96 Act, as we discuss often, was, of course, meant to be very stringent. So it's not surprising that the language of A5 is ordered that way. One of your main responses, and you were talking about this with Justice Kagan, is going past the six-month Civitas period. I guess my question is, there are cases pending in this Court on that question, the constitutional Civitas due process point. Isn't that the better way to analyze this rather than reconfiguring the statute to get to that result? Well, Your Honor, we don't think this requires any reconfiguration of the statute at all. We think we're naturally within 1226, and as for 1231, we think the government has a substantial problem with explaining how the removal period, which is the time during which the government shall remove, can begin and end long before the government has to remove anyone anywhere. So we certainly don't ask for any reconfiguration of the statutes. We just want 1226A and 1231 applied by their terms. Thank you. Justice Barrett? Counsel, when you were answering Justice Kagan's questions, and then again when you were answering Justice Gorsuch, you pointed out that you thought it would be anomalous for those non-citizens who concede removability and litigate only withholding claims to remain within 1226 whereas those who have reinstated orders and litigate withholding only claims would be treated under 1231. And I just want to make sure that I'm tracking that because the government says the dividing line here is once a final order of removal has been entered. And in the normal case, you know, the mine run of cases in which withholding claims are litigated, as you point out, those are in the removal proceedings themselves. So under the government's view, it would make sense that those were under 1226 rather than 1231 because in that situation, there is no final order of removal. So explain to me what the anomaly is. Well, you know, the explanation was why B3 reasonably exists in 1231 and why we draw that inference because if we were, then that category of cases, I think, would come out differently. I appreciate that that is the government's rule, and that's a rule that does not fare well for us. Our rule, of course, is quite different. It turns on whether or not the INA authorizes removal of the individual, and that tracks directly from the text of 1226 and 1231. We think that's the rule the court should adopt in construing these statutes. Okay, and let me ask you this. So we're comparing here two statutes, 1226 and 1231, and I'm trying to figure out how much of the scheme in 1226 that's advantageous in terms of offering a bond hearing to the noncitizen is regulatory and how much is statutory because in your brief on page 7, you say after an initial custody determination by DHS, Congress determined that a noncitizen is entitled to a bond hearing before an IJ. But as support for that, you cite a regulation, not a statutory provision, and as far as I can tell in 1226 itself, the bond hearing looks discretionary because it says that the alien may be released on bond. So why is a bond hearing an entitlement under the statute as opposed to the regulations, and why would it have to be before an IJ rather than an official from ICE as a matter of the statute? Well, thank you, Your Honor. 1226A2, of course, the statute directly requires a bond hearing where there is not the bond hearing requirements in 1231, so it's a direct distinction between the detention provisions. Your Honor, of course, it's correct that it being squarely assigned to an IJ has been done by matter of regulation, HCFR 236.1D. That's certainly the way that this has been implemented. I think there may be a reasonable argument that the bond requirement carries with it the requirement of a neutral arbitrator, but regardless, that is how DHS for decades has implemented this. So the legal structure that comes to the court is a statute that requires the bond and the implementing regulations that put that before a neutral immigration judge. Thank you, Counsel. A minute to wrap up. Mr. Hughes? Thank you, Your Honor. We believe that the language of 1226 here fits perfectly. This is absolutely individuals who are in detention pending a decision on whether the alien is to be removed from the United States. Again, we think the government's position has a very critical flaw that they take the position the removal period begins and almost always ends before they can remove the individual anywhere, and we believe that A1A is the critical provision here because it defines the removal period as the time during which the government must have this authority, and it also accepts from the removal period other provisions in 1231 when the government doesn't have authority to remove, which includes the withholding provisions. That's squarely the case here. Finally, we've certainly not retracted in any. Our argument has been consistent throughout this case. The government's incorrect in saying we've somehow backed away from our argument. It's always been whether or not the INA authorizes removal of the individual. So we've said in the Court of Appeals, in the District Court, and consistently throughout. Thank you, Your Honor. Thank you, Counsel. Mr. Suri, you have three minutes for rebuttal. Mr. Chief Justice, if we take a fair view of this case, we've got some strong arguments under the text of Section 1231, particularly the title, Detention and Removal of Aliens Who Have Been Ordered Removed. They've got some reasonable arguments under Section 1226. How can you say that there's been a decision about whether to remove someone when it's not clear that there's any country available? So I'd like to talk in this rebuttal about a few tiebreakers you might use to side with 1231 over 1226. The first is that even with respect to their arguments in 1226, all they've been able to show is that those provisions are ambiguous. You can read those provisions to refer to the practicalities of removal, or you could read it to refer to the legal decision, i.e., the order of removal itself. The phrases in Section 1231, by contrast, are fairly clear. Ordered removed means ordered removed, and these aliens have certainly been ordered removed. So in those circumstances, what the court should do is use the clarity of Section 1231 to resolve the ambiguity in 1226. It shouldn't use the alleged ambiguity in 1226 to override the clarity of 1231. The second tiebreaker is the structure of the statute. Congress put the reinstatement of removal provision in Section 1231. It also put the withholding provision in Section 1231. So if you find yourself thinking that the text of 1226 and 1231 pull in opposite directions, the structure of the statute tells you that Section 1231 should win out here. The third tiebreaker is this court's precedence. In order for respondents to prevail, they have to adopt a definition of administrative finality that's directly contrary to this court's decision just last term in Nasrallah. They have to say that a cat or withholding order does reset the finality of a removal order. Indeed, that a mere request for such protection resets the finality. That's directly contrary to what the court said, which is that a cat order does not disturb the validity of a final order of removal. The other relevant precedent is this court's decision in Zadvitas. The aliens in Zadvitas find themselves in precisely the same circumstance that respondents are talking about here. The government's looking around for some country to which it can remove them. There may be no such country available. The court didn't say in those circumstances, oh, the decision about whether to remove these aliens hasn't been made, so we're under 1226. It said those aliens were under 1231, and it provided certain procedural protections while they remained there. That's exactly what we asked the court to do here. Thank you. Thank you, Counsel. The case is submitted.